***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Gregory and the briefs and arguments of the parties. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award.
 ***********
The Full Commission finds as a fact and concludes as matters of law the following, which were entered into by parties as:
 STIPULATIONS
1. The parties stipulate that the employee-employer relationship existed on September 17, 2002.
2. The parties stipulate that C.M. Lindsay Sons, Inc. is the defendant-employer and CompTrust AGC is the carrier on the risk, having been the workers' compensation carrier for defendant-employer on the date of the alleged injury.
3. The parties stipulate that they were subject to the North Carolina Workers' Compensation Act at the time of the alleged specific traumatic incident and/or injury by accident.
4. The parties stipulate that plaintiff had an average weekly wage of $645.82 yielding a compensation rate of $430.57.
5. The parties agree that the records of Dion Arthur, M.D. are admissible into evidence, but each side retains the right to depose Dr. Arthur.
6. The parties agree that the records of James E. Rice, M.D., are admissible into evidence, but each side retains the right to depose Dr. Rice.
7. The parties agree that the records of Johnny E. Camargo, M.D. are admissible into evidence, but each side retains the right to depose Dr. Camargo, M.D.
8. The parties agree that the records of Sandhills Regional Hospital from September 17, 2002 through September 25, 2002 are admissible into evidence.
9. Plaintiff's last day worked was September 17, 2002.
10. Defendant-employer regularly employs three or more employees and is bound by the provisions of the North Carolina Workers' Compensation Act.
11. The Industrial Commission has jurisdiction of the parties, and all parties have been properly named in this action.
12. The parties stipulated into evidence Stipulated Exhibits #1 and #2 consisting of a pretrial agreement and a packet of Industrial Commission Forms, medical records and discovery responses.
 ***********
Based upon all of the competent evidence of record the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 42 years old and had completed the ninth grade. Plaintiff is capable of reading and writing. Plaintiff's work history consists of farming and performing construction work for approximately 30 years.
2. Plaintiff worked for defendant-employer in 1995 and again beginning in August or September 1997. Plaintiff's job with the defendant-employer was primarily as a motor grader operator but also included operation of various machinery including a rubber tire backhoe. Defendant-employer's business included road construction work, grading and paving.
3. In April 2001, plaintiff began treating with Dr. Camargo for blood pressure and cardiac problems. On August 14, 2001, Dr. Camargo saw plaintiff for cardiac follow-up care, at which time he reported continued episodes of back pain. Plaintiff reported no earlier injury to Dr. Camargo.
4. On January 16, 2002, plaintiff was admitted to the hospital for hypertension. Plaintiff complained to Dr. Camargo of increased low back pain radiating into his left leg and also complained of anxiety. Due to plaintiff's back complaints, Dr. Camargo prescribed Vioxx and referred plaintiff to orthopaedic surgeon Dr. Dion J. Arthur who first examined plaintiff on January 31, 2002. Plaintiff complained to Dr. Arthur of worsening back and neck pain with left leg pain into his calf. Plaintiff denied any accidents but indicated that he had been out of work due to his pain. Plaintiff was taking Vioxx for his pain and described his pain as constant at a 4 to 6 level on a scale of 10. Plaintiff had a positive straight leg raise test and a positive Bragards on the left. Dr. Arthur felt that plaintiff was suffering from radiculopathy at L5-S1 and ordered an MRI due to plaintiff's "severe" symptoms.
5. An MRI was performed on February 9, 2002, which revealed disc degeneration and a left paracentral herniation at L5-S1. Plaintiff returned to Dr. Arthur on February 18, 2002 for a discussion of the MRI. Plaintiff remained symptomatic and Dr. Arthur ordered an epidural steroid injection. On March 11, 2002, plaintiff returned to Dr. Arthur and reported improvement and resolution of his leg pain after the injection. Plaintiff continued to suffer some residual back pain. Thereafter, plaintiff was to return for a visit in 3 weeks but he did not return at that time.
6. During the time plaintiff was treating with Dr. Arthur, he was not working and was laid off until the end of May 2002. Thereafter, plaintiff worked for defendant-employer during June, July, August and September 2002. Although plaintiff did not return to Dr. Arthur after March 2002 until September 2002, plaintiff did return to Dr. Camargo who continued plaintiff's prescription of Vioxx during April through at least July 2002. On July 17, 2002, plaintiff was again seen by Dr. Camargo at which time his only complaint was continued back pain, significant in nature. Dr. Camargo continued plaintiff's Vioxx and also prescribed additional medications for plaintiff's back condition, Bextra and Skelaxin for pain and muscle relaxation. Accordingly, plaintiff's back pain continued and did not resolve following March 2002.
7. Plaintiff alleges he materially aggravated his pre-existing back condition on September 17, 2002, while digging up thick asphalt using a rubber tire backhoe. According to plaintiff, on September 17, 2002, he was operating a backhoe digging up and removing old asphalt around where a cushion barrier had been located on a bridge site in Chadbourn, North Carolina. A cushion barrier is a separator that is bolted into the asphalt and provides protection from vehicles around work zones and medians. Plaintiff made no mention of digging and removing asphalt around a column holding up the bridge. Plaintiff testified that while removing the thick asphalt with the backhoe and digging up under the asphalt with the bucket of the backhoe, the backhoe raised up off of the ground approximately one and a half feet and when the asphalt broke, the backhoe fell down to the ground suddenly, bouncing and jarring plaintiff in the seat and aggravating his back condition. Plaintiff testified that he immediately felt pain "like a knife stabbing pain" in his low back and extreme radiating pain down his left leg, which became numb.
8. According to plaintiff, Jamael Shorter, his helper, was present and plaintiff told him that he hurt his back and needed to go to his truck. Plaintiff testified that Mr. Shorter had to help him to his truck to prevent plaintiff from falling. Plaintiff testified that he telephoned Dr. Arthur's office from his cell phone once he got to his truck. Telephone records indicate that plaintiff placed a call to Dr. Arthur's office at 9:18 a.m. that morning. Plaintiff contends that when he hung up the telephone, Ken Coyle, his supervisor, approached and plaintiff reported his injury and that he needed to see his physician immediately. Plaintiff indicated that Mr. Coyle asked him to finish his job and plaintiff therefore operated the motor grader while Mr. Shorter ran the backhoe. Plaintiff testified that at approximately 11:45 a.m. he told Mr. Coyle he had performed all of the work he could and needed to go to the doctor's office.
9. Mr. Shorter who had worked with plaintiff on five to six other job sites testified that he recalled an incident that occurred while plaintiff was operating a backhoe on September 17, 2002. However, Mr. Shorter's testimony differs from that of plaintiff. Mr. Shorter testified that near lunch time, 10:30 a.m. or 11:00 a.m., the backhoe popped up and jerked around approximately three times while plaintiff was digging out asphalt from around columns that hold up the bridge. Mr. Shorter made no mention of a cushion barrier as described by plaintiff. Mr. Shorter further testified that plaintiff commented that he thought he might have "messed up" his back. Mr. Shorter made no mention of helping plaintiff to his truck or of plaintiff experiencing any difficulty walking. According to Mr. Shorter, the alleged incident occurred close to lunchtime around 10:30 or 11:00 a.m. and as soon as Mr. Coyle arrived plaintiff left the job site. Mr. Shorter indicated that after plaintiff spoke to Mr. Coyle, plaintiff got into his truck and left. Mr. Shorter did not hear the conversation between Mr. Coyle and plaintiff. Mr. Shorter contended at his deposition that he voluntarily quit his employment with defendant-employer due to the lack of a requested salary increase but according to the testimony of C.M. Lindsey, Jr. or "Junior", Mr. Shorter was terminated for damaging a vehicle.
10. While plaintiff contends that he reported an injury to Mr. Coyle, Mr. Coyle was not present to testify and was not deposed following the hearing before the deputy commissioner. C.M. Lindsey, Jr. or "Junior" testified that plaintiff did not report an injury but at first indicated during a conversation after lunch on September 17, 2002 that it would be his last day because he would be undergoing surgery in six weeks. Furthermore, according to Mr. Lindsey plaintiff indicated that he was afraid to operate the backhoe because he felt it could cause more damage to his back. Mr. Lindsey indicated that plaintiff did not have to run the backhoe and later told his secretary and sister, Ms. Debra Lindsey Arnette, that he would continue plaintiff's insurance for 3 months to make sure the surgery was covered. According to Mr. Lindsey, plaintiff later telephoned to inquire about unemployment benefits; however, Mr. Lindsey indicated that plaintiff was probably not eligible for unemployment. Approximately, a week after the first telephone call, plaintiff telephoned again and inquired about workers' compensation and for the first time reported that he was injured at work on the Chadbourn project. When Mr. Lindsey questioned plaintiff, plaintiff indicated that the injury was on the Sanford project, which occurred in 1999 to 2000. Plaintiff never filed a claim for this alleged injury.
11. According to Ms. Arnette, plaintiff telephoned her in late September 2002 and requested that she lay him off since he was scheduled for surgery. Ms. Arnette suggested that plaintiff contact the Employment Security Commission. However, plaintiff indicated that he could not receive unemployment benefits because of his medical condition. In addition, plaintiff related to Ms. Arnette that he had been injured while working on the Sanford project, not the Chadbourn project.
12. On September 17, 2002, plaintiff was seen at Sandhills Regional Medial Center at approximately 3:30 p.m. where he underwent x-rays ordered by Dr. Arthur's office. There is no notation in the records regarding an injury or an increase in plaintiff's symptoms.
13. On September 19, 2002, two days after the alleged injury, plaintiff returned to Dr. Arthur who examined plaintiff and reviewed the x-rays and an MRI. Plaintiff displayed clinical findings of a radiculopathy. Dr. Arthur noted that plaintiff had failed lengthy conservative management, which had begun in January 2002. Significantly, Dr. Arthur's notes mention no injury at work and, in fact, no worsening of plaintiff's symptoms or condition. Specifically, Dr. Arthur noted that plaintiff's symptoms had not improved and that plaintiff wished to undergo surgery. Dr. Arthur further indicated at his deposition that no exacerbation of plaintiff's condition was mentioned by plaintiff and that any report of injury or aggravation would have been documented in his notes. Dr. Arthur recommended clearance for surgery from Dr. Camargo. Dr. Arthur did not remove plaintiff from work.
14. Hospital records from Sandhills Regional Medical Center dated September 20, 2002 indicate that surgery had been scheduled but then cancelled by the doctor and patient. In addition, on September 20, 2002, a nurses' record from Carol McMahan, RN indicates that plaintiff's pain is precipitated by climbing, lifting, and bending. Furthermore, plaintiff attributed his problem to a "bad disc" and indicated that his pain was a level 5 on a scale of 10, similar to that recorded in January 2002 by Dr. Arthur. Once again, no mention was made of a work-related injury or aggravation caused by operating a backhoe.
15. On September 25, 2002, Dr. Camargo wrote Dr. Arthur a letter after plaintiff was seen for a pre-operative cardiac evaluation by Dr. Camargo who examined plaintiff and took a history. No mention is made in Dr. Camargo's letter regarding an injury at work or an exacerbation of plaintiff back and leg pain.
16. On October 1, 2002, plaintiff contacted Lisa Young, a secretary at defendant-employer, and related that he had been injured on both the Chadbourn and the Sanford sites.
17. On October 7, 2002, plaintiff returned to Dr. Arthur who again noted no history of an injury at work but rather failed conservative treatment of plaintiff's L5-S1 disc herniation. Dr. Arthur related the risks and benefits of surgery and plaintiff indicated that he wished to pursue surgery. The next day, October 8, 2002, plaintiff was seen by Dr. Camargo for surgical clearance. Again, plaintiff made no mention to Dr. Camargo of an injury at work.
18. Plaintiff reported no injury at work or increase in pain to Dr. Arthur until a pre-operative visit on October 15, 2002, at which time plaintiff refused to proceed until he and his wife could discuss with Dr. Arthur that plaintiff's condition resulted from a workers' compensation injury. Plaintiff and his wife requested that Dr. Arthur change his records to note the injury but Dr. Arthur refused to change his earlier notes and instead documented the new information in his October 15, 2002 note. The surgery did not take place on October 15, 2002, and plaintiff did not return to Dr. Arthur for further treatment. Plaintiff contends that Dr. Arthur was attempting to secure more beneficial payment via plaintiff's deductible and health insurance rather than documenting plaintiff's condition as a workers' compensation claim. However, Dr. Arthur adamantly denied plaintiff's contention and testified that workers' compensation benefits are more beneficial and prompt. Plaintiff's contention regarding Dr. Arthur's motives and conduct is afforded no weight.
19. During October 2002, plaintiff contacted the Industrial Commission and received a Form 18, which he completed and returned to the Commission on approximately November 13, 2002. Plaintiff's Form 18 indicates that he was injured on September 17, 2002 from bouncing and jarring while using a backhoe to dig up thick asphalt.
20. Plaintiff next treated with Dr. James E. Rice, of Sandhills Orthopedic and Spine Clinic on October 30, 2002. Plaintiff reported a history of back problems made significantly worse while operating a backhoe on September 17, 2002 after being bounced and jarred while digging up asphalt. This is the first report of the incident on the backhoe in any medical notes and the first documentation that plaintiff alleged that his back pain was much worse since the incident. In fact, as provided to Dr. Rice, plaintiff's history of injury as well as his indication of an increase in symptoms is contradictory to the greater weight of the evidence of record, in particular, the medical records which are in closest proximity to plaintiff's alleged injury or increase of symptoms. In addition, Dr. Rice was not fully aware of plaintiff's course of conservative treatment with Dr. Arthur.
21. Dr. Rice diagnosed plaintiff with lumbar disc disease with sciatica and ordered an MRI scan. The MRI was performed on November 2, 2002 by the same radiologist who performed plaintiff's February 2002 MRI. According to both the MRI report and Dr. Rice, the MRI results were basically unchanged from those of the previous MRI performed in February 2002. As a result, plaintiff was treated conservatively, primarily through prescription medication management, which was the same treatment that plaintiff had been undergoing with Dr. Arthur and Dr. Camargo who had continued to prescribe medications for plaintiff throughout the Spring and Summer of 2002 prior to plaintiff's alleged injury or aggravation.
22. Surveillance footage obtained during June and July 2003 documented plaintiff walking with and without a cane and sometimes with a slight limp. However, the footage revealed plaintiff was capable of performing more activities than he contended at the hearing including walking distances, bending to a 90 degree angle, stooping and detailing a vehicle during approximately a one hour time period without appearing to suffer significant pain. In fact, plaintiff detailed church members' vehicles for food or money on numerous occasions. To the extent that plaintiff or plaintiff's witnesses indicate that plaintiff was not capable of performing a quality detailing job in a reasonable amount of time, their testimony is afforded little weight. However, the videotaped activity does not demonstrate plaintiff's ability to perform heavy duty construction work over an eight-hour work day. Regardless, it confirms that plaintiff is capable of performing a greater level of activity than he contended at the hearing and that he has been at a minimum capable of working with restrictions.
23. Dr. Rice treated plaintiff for his back pain until July 16, 2003, at which time, Dr. Rice felt plaintiff was at maximum medical improvement with respect to his back. In fact, at this time, plaintiff mainly complained of neck and arm complaints. At no time during his treatment of plaintiff from October 30, 2002 through July 16, 2003, did Dr. Rice remove plaintiff from all work or offer any treatment other than medication management very similar to that plaintiff received under the care of Dr. Camargo and Dr. Arthur. Furthermore, Dr. Rice has not recommended surgery and does not foresee surgery as a likely recommendation for plaintiff's future treatment.
24. Dr. Rice felt that plaintiff probably reached maximum medical improvement by July 17, 2003 with a maximum rating of a 5% impairment rating to his back. In addition, according to Dr. Rice, plaintiff's use of a cane was not medically necessary based upon his evaluations of plaintiff's condition. Regardless, plaintiff never sought employment following September 17, 2002. During the time Dr. Rice treated plaintiff, he was at a minimum capable of activities that allow frequent change of position, and do not require an excessive amount of bending and heavy lifting. Dr. Rice also limited plaintiff's lifting to 30 pounds. While Dr. Rice felt it might be difficult for plaintiff to return to construction work, the activities he saw plaintiff perform on the surveillance video reinforced that plaintiff was capable of doing work within the restrictions Dr. Rice recommended. Dr. Rice indicated that the restrictions would accommodate plaintiff's new complaints of neck and arm pain.
25. On March 31, 2003, plaintiff underwent a vocational evaluation by Mr. Stephen Carpenter who felt that plaintiff would benefit from retraining; however, Mr. Carpenter met with plaintiff on one occasion and did not consider the full extent of plaintiff's capabilities. Mr. Carpenter's testimony is insufficient to prove that any search for employment by plaintiff following September 17, 2002 would have been futile or that no suitable employment existed for plaintiff within his restrictions without first undergoing retraining. In particular, considering Dr. Rice's testimony and the greater weight of the evidence of record, Mr. Carpenter's opinion that plaintiff could not perform employment detailing vehicles is afforded little weight.
26. At the hearing, plaintiff testified to a wide variety of physical limitations including bending, walking, standing, lifting and use of a cane. However, plaintiff's testimony was contradicted by witness testimony and the surveillance video evidence submitted by defendants. As such, the plaintiff's testimony is contrary to the greater weight of the evidence.
27. Plaintiff was first diagnosed with a radiculopathy at L5-S1 by Dr. Dion J. Arthur on January 31, 2002. An MRI examination in February 2002, revealed degenerative changes including a herniated disc at L5-S1, which caused plaintiff pain, for which plaintiff was treated conservatively by Dr. Arthur and Dr. Camargo. Both Dr. Rice and Dr. Arthur stated that the MRI scan ordered in November 2002, was unchanged from the MRI performed in February 2002. Furthermore, both Dr. Rice and Dr. Arthur stated that the condition of plaintiff's back as demonstrated by the MRI taken in February 2002, eight months before the alleged aggravation, could explain the symptoms plaintiff was experiencing when he returned to Dr. Arthur on September 19, 2002, and when he presented to Dr. Rice on October 30, 2002. Both Dr. Rice and Dr. Arthur stated plaintiff's alleged increased back symptoms could have resulted from a progression of plaintiff's degenerative disc disease rather than the alleged incident. Moreover, based upon Dr. Arthur's records and other hospital records which were in recorded in closest proximity to the alleged aggravation, plaintiff did not complain of an increase or worsening in back pain, much less an injury, but rather indicated that his symptoms had not resolved with the conservative treatment which plaintiff continued to receive through medication management with Dr. Camargo. In essence, the greater weight of the evidence fails to prove that plaintiff sustained a material aggravation of his pre-existing condition on or about September 17, 2002 but rather plaintiff experienced a continuation of pain that was significant during the summer of 2002 and was continuously treated through medication management. Plaintiff's contention to the contrary is afforded less weight.
28. Furthermore, both Dr. Rice and Dr. Arthur testified that plaintiff could have experienced an aggravation of his condition through routine or daily events. Both Dr. Rice and Dr. Arthur stated the types of activities plaintiff was seen engaging in on the surveillance video could have aggravated plaintiff's condition. Dr. Arthur also stated that an aggravation could occur spontaneously without any physical exertions by plaintiff. Dr. Rice stated that assuming plaintiff engaged in routine household activities and the activities on the surveillance video, from February 2002, until he first saw plaintiff and considering the MRI findings were unchanged, he could not say with any reasonable degree of medical certainty what caused plaintiff's alleged increase in symptoms. Finally, when posed a hypothetical regarding the likelihood of the bouncing and jarring by the backhoe as an aggravating factor of plaintiff's condition, Dr. Rice indicated that it could have irritated or inflamed plaintiff's degenerative condition. However, Dr. Rice specified that while there was a likelihood that an injury could worsen or aggravate a pre-existing condition, there was also a likelihood that the condition could remain the same or get better with time. Dr. Rice could not testify to a reasonable degree of medical probability that plaintiff's alleged injury more likely than not materially aggravated plaintiff's pre-existing back condition. Finally, to the extent that Dr. Rice's testimony supports a causal connection between plaintiff's alleged injury by way of a material aggravation and his current back condition, Dr. Rice's testimony is based upon temporal grounds, a lack of information, and inaccurate assumptions and history.
29. In weighing the evidence in this case, the Full Commission has considered the inconsistencies in the evidence of record including those that exist between the documentary evidence and the testimony of the witnesses. Considering the greater weight of the evidence of record, plaintiff failed to prove that his alleged injury on September 17, 2002 resulted in a material aggravation of his pre-existing back condition. Furthermore, the greater weight of the evidence fails to demonstrate that plaintiff sustained an injury by accident arising out of and in the course of his employment with the employer on or about September 17, 2002 resulting in any compensable consequences. The greater weight of the evidence further establishes that plaintiff had experienced problems with his back prior to September 17, 2002, and any symptoms plaintiff experienced on or after September 17, 2002, were a continuation of his pre-existing condition. To the extent that the record contains evidence to the contrary, this evidence is afforded less weight. Specifically, the testimony and records of Dr. Arthur and of the hospital, which contradict plaintiff's contentions, are afforded greater weight. Plaintiff's allegations concerning Dr. Arthur's credibility are afforded little weight.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiff did not sustain an injury by accident arising out of and in the course of his employment with the defendant-employer or a specific traumatic incident of the work assigned on September 17, 2002, which resulted in any compensable consequences by way of a material aggravation of a pre-existing condition. Assuming arguendo that plaintiff sustained an incident on September 17, 2002, plaintiff has nevertheless failed to prove that such incident resulted in a material aggravation of his pre-existing back condition. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff has failed to prove by the greater weight of the medical evidence that he sustained a material aggravation of a pre-existing condition as a result of his alleged work-related injury or a causal link between any alleged injury and his back condition following September 17, 2002. N.C. Gen. Stat. § 97-25; Holly v. Acts Inc., 357 N.C. 228,581 S.E.2d 750 (2003).
3. Plaintiff is entitled to no benefits under the Workers' Compensation Act. N.C. Gen. Stat. § 97-2 et seq.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiff's claim for workers' compensation benefits is hereby, and the same shall be, Denied.
2. Each side shall bear its own costs.
This the 25th day of October 2004
 S/_______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
DCS/mb